IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* BILL LOCKYER, ATTORNEY GENERAL,<br><br>                    Plaintiff,<br><br>        v.<br><br>UNITED STATES FOREST SERVICE, et al.,<br><br>                    Defendants. | No. C 04-02588 CRB<br><br>**MEMORANDUM AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS** |

The Sequoia National Forest ("the Forest") in the Sierra Nevada mountains of California is a national forest managed by defendant United States Forest Service ("the Forest Service"). Plaintiff, People of the State of California ("California"), claims the Forest Service did not comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, when it failed to prepare an Environmental Impact Statement ("EIS") before approving the Sequoia National Forest Fire Management Plan. Defendant claims that the Fire Plan is exempt from NEPA because it is not a decisional document. The parties agree that no EIS was prepared for the Fire Plan; the contested issue is whether, as a matter of law, the Fire Plan is subject to NEPA requirements.

After reviewing the memoranda and exhibits submitted by the parties and with the benefit of oral argument on June 17, 2005, the Court hereby grants plaintiff's motion for

summary judgment and denies defendant's cross-motion for summary judgment and motion for judgment on the pleadings for the reasons set forth below.

## BACKGROUND

The 2004-2005 Sequoia National Forest Fire Management Plan ("Fire Plan") is one of several documents governing the Forest Service's response to wildland fires in specific locations within the Sequoia National Forest. Wildland fires are naturally occurring fires in areas without significant human development. 2004 Fire Plan at Appendix AE. Wildland fires may place adjacent human communities at risk, and may harm Forest ecosystems and endangered species. However, some level of fire is necessary within the Forest, both because certain plants (including Giant Sequoia trees) need fire to reproduce, and because, in the absence of any moderate-level fires, old growth builds up in the Forest and creates a high risk of uncontrollable, catastrophic-level wildfires.

The Forest Service uses wildland fires, as well as prescribed fire (intentionally lit, controlled burns) and "mechanical treatments" (including logging), to alleviate the risk of catastrophic-level wildfires and to maintain fire-dependant ecosystems in the Forest. Fire Plan at 8. Possible Forest Service responses to wildland fire include letting the fire burn; containing and controlling the fire to various degrees; or immediately and completely suppressing the fire. Fire Plan at 7, 8. The Fire Plan geographically divides the Forest into three Fire Management Units ("FMUs"), and specifies which wildland fire responses may be used in each. Fire Plan at 8. The Fire Plan also specifies the goal of annually treating a specific number of acres in each FMU to reduce fuel hazards and fire risk. Id. The three FMUs are defined in the Fire Plan as: FMU #1-Wildland Fire Use (Wilderness); FMU #2-Suppression and Restricted Wildland Fire Use; and FMU #3-Suppression. Id.

The Fire Plan is one in a larger universe of documents, of varying geographic and subject-matter specificity, addressing fire management policy within Sequoia National Forest. These include regional and forest-level land and resource management plans and "frameworks," which address fire management as well as all other aspects of forest

///

management; and national fire management policy documents, which establish broad fire management policy.

Plaintiff contends that the Fire Plan includes important decisions on fire management within the Forest, and as such should have been subject to NEPA review, including the preparation of an EIS.  Defendant claims that the Fire Plan merely implements programmatic-level policy decisions that were made in earlier, NEPA-compliant documents and postpones ground-level decisions until site-specific projects are initiated and so, as a non-decisional document, the Fire Plan was not required to undergo NEPA review.

## ANALYSIS

### I. Motion for Judgment on the Pleadings

Before addressing the merits, as a preliminary matter the Court must address whether plaintiff has standing to pursue this claim.  Defendant argues that plaintiff lacks constitutional standing under Article III and also fails to state a ground for statutory standing under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq*.  Defendant's assertions lack merit, and therefore plaintiff possesses standing to sue.

**A. Constitutional Standing**

Whether a party has standing to invoke federal court jurisdiction is a threshold question that courts are required to address when raised, prior to deciding the merits.  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-96 (1998); Pershing Park Villas Homeowners Ass'n v. United Pacific Insurance Co., 219 F.3d 895, 899 (9th Cir. 2000).

   1. *Parens Patriae*

As a preliminary matter, defendant argues that the Attorney General lacks standing to bring this case because he has brought in the name of the People of the State of California, and therefore the suit is based on a theory of *parens patriae*.  Under this theory, a state has the right to assert "quasi-sovereign interests" in "the well-being of its populace," including both physical and economic well-being.  Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 602, 607 (1982).  However, "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government."  Id. at 610 n. 16; see also Massachusetts v.

3

Mellon, 2626 U.S. 447, 485-86 (1923) (a state may not enforce the rights of its citizens in relation to the federal government because, in such instances, it is the United States, not the state, that represents them as *parens patriae*). While plaintiff attempts to distinguish the statement in Snapp as dicta, the Ninth Circuit has unequivocally endorsed it as binding authority. See Nevada v. Burford, 918 F.2d 854, 858 (9th Cir. 1990) (stating that Ninth Circuit authority to the contrary must "give way to the Supreme Court's clear statement in Snapp."). Therefore, California may not bring this suit *parens patriae*.

### 2. Standing Based on State Interests

Although California may not obtain Article III standing on a *parens patriae* theory, its ability to bring this case will not be defeated if it can show that the state has relevant interests that are independent of the rights of its citizens. See Davis v. United States EPA, 336 F.3d 965, 971 (9th Cir. 2003). If California can do so, then it may also argue on behalf of the broader public interest in protection of Sequoia National Forest resources and in Forest Service NEPA compliance without bringing suit as *parens patriae*. See City of Davis v. Coleman, 521 F.2d 661, 672 n.14 (9th Cir. 1975) ("a plaintiff who establishes standing in his own right may then argue the public interest as well").

To establish Article III standing to invoke federal court jurisdiction, a plaintiff must demonstrate: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000). Plaintiff bears the burden of establishing these elements. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).

The complaint asserts a procedural injury: that defendant did not comply with NEPA. The Ninth Circuit has held that, with respect to procedural injury, "'to show a cognizable injury in fact, [a plaintiff] must allege . . . that (1) the [agency] violated certain procedural rules; (2) these rules protect [a plaintiff's] concrete interests; and (3) it is reasonably probable that the challenged action will threaten their concrete interests.'" City of Sausalito v.

4

O'Neill, 386 F.3d 1186, 1197 (9th Cir. 2004) (internal citations omitted) (modification in original). The court went on to find that "a cognizable procedural injury exists when a plaintiff alleges that a proper EIS has not been prepared under the National Environmental Policy Act when the plaintiff also alleges a 'concrete' interest--such as an aesthetic or recreational interest--that is threatened by the proposed action." City of Sausalito, 386 F.3d at 1197.

California has established standing based on its allegations that defendant failed to prepare an EIS, and its concrete interest in two state-owned forests that may be threatened by the fire management actions provided for in the Fire Plan. The Mountain Home State Forest, a 5,000 acre tract of giant sequoias, and Whittaker Forest, a research forest managed by the University of California, are both state-owned and entirely within the boundaries of Sequoia National Forest.[1]  See Compl. ¶¶ 12, 44; Polsky Decl. at ¶¶ 3-6 & Exh. Q, R, S and T. California has a proprietary interest in these state-owned properties that may be affected by the Fire Plan. See City of Sausalito, 386 F.3d at 1198 (finding "constitutionally sufficient injury to proprietary interests where 'land management practices of federal land could affect adjacent [city]-owned land.'"); see also City of Davis v. Coleman, 521 F.2d 661, 671 (9th Cir. 1975) ("The procedural injury implicit in agency failure to prepare an EIS . . . is itself a sufficient 'injury in fact' to support standing, provided this injury is alleged by a plaintiff having a sufficient geographical nexus to the site of the challenged project that he may be expected to suffer whatever environmental consequences the project may have."). Cf. Burford, 918 F.2d at 857 (stating there was no standing because "Nevada did not allege in its complaint that it uses the land surrounding [the federal property at issue] for any purpose.").

The Forest Service argues that plaintiff failed to mention the state-owned forests by name in the complaint and so may not rely on them to establish standing. However, plaintiff

---

[1] Contrary to defendant's claim, the fact that the California Department of Forestry and Fire Protection may have at one time expressed a view favoring suppression in the Mountain Home State Forest, see Letter to Sequoia National Supervisor Gaffery of 3/10/03, Def. Exh. H, does not defeat plaintiff's concrete interests in this case. Even if the cited letter can be read to make such a statement, the Attorney General would still be free to take a different view in exercising his common-law authority to protect State interests by bringing a lawsuit. See People v. Birch Sec. Co., 86 Cal. App. 2d 703, 707 (Cal. Ct. App., 1948).

alleges in its complaint that there is state-owned land within the boundaries of Sequoia National Forest, Compl. ¶ 12, and that the Fire Plan may impair the natural resources of California, Compl. ¶ 44. These allegations sufficiently articulate the state's concrete interest in this matter. See Cook v. Winfrey, 141 F.3d 322, 326 (7th Cir. 1998) ("Imperfections in pleading style will not divest a federal court of jurisdiction where the complaint as a whole reveals a proper basis for jurisdiction." (citation omitted)). Further in determining its jurisdiction, the Court may look beyond the complaint to other evidence in the record. See St. Clair v. City of Chico, 880 F.2d 199, 201 (9th Cir. 1989); Capitol Indus.-EMI, Inc. v. Bennett, 681 F.2d 1107, 1118 n.29 (9th Cir. 1981). Here the record contains maps and other matter clearly indicating the geographical proximity of the State-owned parks to the Sequoia National Forest. See Polsky Decl. at ¶¶ 3-6 and Exh. Q, R, S and T. Therefore no amendment to the complaint is necessary.

The Forest Service also argues that plaintiff failed to submit sufficient evidence at the summary judgment stage to support the possibility of harm to the state-owned forests. Forest ecosystems and endangered species do not recognize property lines; it is therefore reasonably probable that the decision to suppress a fire or thin a strand of trees on federal lands that are immediately adjacent to the state's forests will harm plaintiff's concrete interests.

Defendant also asserts that any harm alleged by plaintiff is not sufficiently immediate to satisfy the injury in fact requirement. "The relevant inquiry for the immediacy requirement in the procedural context is whether there is a 'reasonable probability' that the challenged procedural violations will harm the plaintiffs' concrete interests." Citizens for Better Forestry v. United States Dep't of Agriculture, 341 F.3d 961, 975 (9th Cir. 2003). Under Citizens for Better Forestry, broader programmatic decisions that will influence decisions at the site-specific level satisfy this requirement. Id. The Fire Plan establishes treatment goals and wildland fire responses for each FMU; this will influence the site-specific decision to suppress a specific naturally-ignited fire or thin a specific strand of trees, so the immediacy requirement is satisfied.

///

Because plaintiff has established a concrete property interest in the two state-owned forests, the Court need not reach the parties' arguments as to whether California's other asserted interests would be sufficient to support standing. However, the Court notes that plaintiff could also establish concrete interests sufficient to support standing in plaintiff's proprietary interest in the state's wildlife, see Compl. ¶¶ 15, 16, 23; Betchart v. California Department of Fish and Game, 158 Cal. App. 3d 1104, 1106 (1984), and economic interests in both the federal-state cooperative fire response agreement, see Davis v. U.S. EPA, 348 F.3d 772, 778 (9th Cir. 2003); Pl. Exh. U and V, and tourist revenues, see City of Sausalito, 386 F.3d at 1199.

Under the three-step test for Article III standing, after establishing injury in fact, plaintiff must also establish that "(2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." City of Sausalito, 386 F.3d at 1197. "'Once a plaintiff has established an injury in fact under NEPA, the causation and redressability requirements are relaxed.'" Citizens for Better Forestry, 341 F.3d at 975 (citations omitted). The Court finds that plaintiff has met both of these requirements.

Defendant contests that the injury is fairly traceable to the alleged non-compliance with NEPA. However, there can be no serious dispute about causation because the alleged procedural injury is necessarily caused by defendant's choice not to undergo NEPA procedures or prepare an EIS for the Fire Plan. See Citizens for Better Forestry, 341 F.3d at 975.

With regards to the redressability requirement, "[a] petitioner 'who asserts inadequacy of a government agency's environmental studies . . . need not show that further analysis by the government would result in a different conclusion. It suffices that . . . the [agency's] decision *could be influenced* by the environmental considerations that [the relevant statute] requires an agency to study.'" Citizens for Better Forestry, 341 F.3d at 975-76 (internal citations omitted and emphasis and alterations in original). This is a relatively easy burden to meet. Id. at 976. Since defendant might have made different decisions in the Fire Plan had

7

they prepared an EIS and received public commentary, injunctive relief ordering them to subject the Fire Plan to NEPA procedures would redress the alleged injury.

In sum, the Court finds that plaintiff has established the three elements required for procedural injury in fact under City of Sausalito. 386 F.3d at 1197. Defendant's objection to this suit based on Article III is therefore rejected.

### 3. Authority of the California Attorney General to Bring this Action

The Forest Service argues that even if California has an interest that would satisfy the "concrete interests" requirement for procedural injury in fact, plaintiff does not have statutory authority to sue the federal government to protect these interests under Cal. Gov't Code section 12607.[2] See Compl. ¶ 7. Therefore, defendant argues, plaintiff has not shown that it has the statutory authority to base its claims on injury to the sovereign interests of the state.

Defendant is correct that the Attorney General may not sue the federal government under section 12607. The statute authorizes the Attorney General to bring suit on behalf of the people against any "person," which is defined to include several private and public entities, but not the federal government. See Cal. Gov't Code § 12604. This omission indicates that the United States is not suable under the statute. See United States Dep't of Energy v. Ohio, 503 U.S. 607, 617-18 (1992).

Nonetheless, even though the Attorney General lacks authority to bring this suit under section 12607 on behalf of California citizens, he still retains broad common law authority to sue the federal government to protect the state's interests. See D'Amico v. Board of Medical Examiners, 11 Cal.3d 1, 14 (1974) (citing Pierce v. Superior Court of Los Angeles County, 1 Cal. 2d 759, 761-62 (1934)); People v. Birch Sec. Co., 86 Cal. App. 2d 703, 707 (Cal. Ct. App., 1948). That section 12604 does not provide an avenue for the Attorney General to sue the federal government does not extinguish his common law authority to do so. See Cal.

---

[2]Section 12607 provides:

The Attorney General may maintain an action for equitable relief in the name of the people of the State of California against any person for the protection of the natural resources of the state from pollution, impairment, or destruction.

8

1  Gov't Code § 12601 (remedies provided under this article are in addition to remedies
2  available at common law); Cal. Gov't Code §§ 12600, 12603 (article is to be liberally
3  construed in favor of underlying purposes to protect California's natural resources); People
4  ex rel. Deukmejian v. Brown, 29 Cal. 3d 150, 157 (1981) (A court may consider common
5  law authority so long as it is not superseded by or in conflict with constitutional or statutory
6  provisions). In addition to his common-law powers, the Attorney General also has statutory
7  authority over "all legal matters in which the State is interested" and the duty to "prosecute or
8  defend all causes to which the State . . . is a party . . . ." See Cal. Gov't Code §§ 12511,
9  12512. This statutory authority provides an alternative basis for the Attorney General's
10 ability to bring this case. See California Air Resources Bd. v. Hart, 21 Cal. App. 4th 289,
11 295 (1993); People v. Stratton, 25 Cal. 242, 246-47 (1864) (under precursor to section 12511,
12 the Attorney General may bring suit "in a case where the matter involved in the suit
13 immediately concerns the rights and interests of the State.").
14    Defendant's claim that dismissal is warranted because plaintiff failed to allege in the
15 complaint that he has authority to bring this action under common law authority or under one
16 of the applicable statutes has no merit. First, defendant has provided no support for the
17 proposition that any time the Attorney General brings a lawsuit he must state in the complaint
18 the source of his authority to do so. Although the Attorney General's authority to bring a
19 case is a jurisdictional matter, see People v. Oakland Water Front Co., 118 Cal. 234, 239
20 (1897), even on a motion to dismiss the Court may consider matter outside of the complaint
21 to determine its jurisdiction. See St. Clair, 880 F.2d at 201.
22    It is therefore clear that the complaint should not be dismissed based on the Attorney
23 General's lack of authority to bring this action under California Government Code section
24 12607.
25    **B. Statutory Standing under NEPA and the APA**
26    In addition to constitutional standing, a plaintiff must establish statutory standing
27 under NEPA in order to sue. City of Sausalito, 386 F.3d at 1199. Because NEPA does not
28 provide a private right of action, parties alleging NEPA violations must establish a right to

9

1  review under the APA.  <u>Oregon Natural Res. Council Action v. Bureau of Land Mgmt.</u>, 150
2  F.3d 1132, 1135 (9th Cir. 1998).  A plaintiff bringing claims under the APA must
3  demonstrate: "'(1) that there has been final agency action adversely affecting the plaintiff,[3]
4  and (2) that, as a result, it suffers legal wrong or that its injury falls within the zone of
5  interests of the statutory provision the plaintiff claims was violated.'"  <u>Citizens for Better</u>
6  <u>Forestry</u>, 341 F.3d at 976.  The "zone of interest" prong is easily met here because California
7  is "trying to protect the environment, and [its] suit thus lies well within NEPA's zone of
8  interests."  <u>See</u> <u>Citizens for Better Forestry</u>, 341 F.3d at 976.  Therefore, whether there was
9  "final agency action" will determine California's standing to sue.
10         Final agency action is action that "mark[s] the consumation of the agency's decision
11  making process," and action "by which rights or obligations have been determined or from
12  which legal obligations flow." <u>Bennett v. Spear</u>, 520 U.S. 154, 177 (1970); <u>Ecology Ctr., Inc.</u>
13  <u>v. U.S. Forest Serv.</u>, 192 F.3d 922, 925 (9th Cir. 1999) (quoting <u>Bennett</u>).  The Court finds
14  that legal obligations flow from the Fire Plan because it is only the existence of a signed Fire
15  Plan that authorizes on-the-ground fire managers to depart from the default national policy of
16  total fire suppression throughout the entire forest. Polsky Decl., Exh. A (1995 Federal Fire
17  Policy) at 10.  In addition, the Fire Plan is the consummation of the agency's decision
18  making process with regards to the Fire Plan's establishment of three geographically distinct
19  Fire Management Units, and specifically the policy of total fire suppression in FMU #3 and
20  the annual acreage treatment goals for each FMU.
21         Defendant concedes that the specific boundaries of the FMUs were not laid out in
22  earlier documents, but maintains that they were driven by established factors, such as the
23  previously established geographic areas of Wildland Urban Intermix, 2001 Framework at
24  Vol. 1, Chap. 2, p. 12, and that therefore the relevant decisions were all made in earlier
25  documents.  However, even if all of the elements considered in establishing the boundaries of

---

[3] A failure to act can constitute final agency action under the APA. <u>Northcoast Envtl. Ctr.</u> <u>v. Glickman</u>, 136 F.3d 660, 668 (9th Cir. 1998).  Plaintiff has pled that the Forest Service's failure to prepare an environmental impact statement is a failure to act within the meaning of the APA. Compl. ¶ 66. Since the Fire Plan constitutes final agency action for the reasons discussed below, the Court need not reach this issue.

10

the FMUs were set forth in other documents, the precise FMU boundaries are not dictated by previously established factors, nor is there any way for a would-be NEPA commentator to accurately predict how these many factors are combined to result in the final boundaries. It is simply not the case, as defendant argues, that the Wildland Urban Intermix dictates the boundaries of the FMUs. Portions of the Wildland Urban Intermix are included in all three FMUs, as are areas of high, medium and low fire risk. See Maps 1-4.

One of the consequences of assigning an area to FMU #3 rather than FMU #2 or #1 is that any naturally occurring fire in that area can not be managed for resource benefit, because all fires must be immediately suppressed. While fire suppression in certain types of areas was envisioned in earlier documents, the Fire Plan is the first document to decide in exactly which geographic areas fire must be immediately suppressed. This constitutes final agency action. See Environmental Protection Information Center (EPIC) v. United States Forest Service, No. C-02-2708 JCS, 2003 WL 22283969 (N.D. Cal 2003).

Defendant claims that the Fire Plan is not the consummation of the agency's decision making process because the wildland fire responses for each FMU are merely recommendations and leave broad discretion in the hands of the on-the-ground fire manager. This is not the case for FMU #3. The Fire Plan states that "[w]ildland fires occurring in FMU #3 will not be managed for resource benefit and will be suppressed through initial attack."[4] Fire Plan at 21. This language cannot be fairly read as a recommendation. Defendant also argues that the annual acreage treatment goals for each FMU are recommendations because their implementation depends on funding, as well as the number and timing of naturally occurring wildland fires. Simply because the treatment goals may be thwarted by forces beyond the Forest Service's control does not reduce the binding instructions in the Fire Plan to mere recommendations. See Port of Astoria v. Hodel, 595 F.2d 467, 478 (9th Cir. 1979) (finding that, even though the details of a plan remained

---

[4]This statement is limited by a narrow exception which allows deviation from the general rule for wildfires in areas "surrounded by" other FMUs in which there is a written agreement with the landowner to manage fires consistent with the strategy for the surrounding FMU. See Fire Plan at 21. This exception does not undermine, and indeed supports, the notion that the Fire Plan constrains the fire managers to follow the procedures outlined in the Plan.

11

unsettled, because the plan was a long-range regional policy with set goals and because there was no indication that these policies would be abandoned, the plan should have been subject to NEPA review); see also Kern v. United States Bureau of Land Management, 284 F.3d 1062, 1072 (9th Cir. 2002) (an agency may not avoid NEPA review simply because the consequences of a plan are unclear).

The Forest Service is also incorrect in arguing that there was no final agency action because the boundaries of the FMUs are subject to revision based on changed conditions. NEPA regulations contemplate that significant changes in plans or circumstances may require preparation of supplemental analyses. See 40 C.F.R. § 1502.9(c). Potential future changes therefore do not exempt current decisions from NEPA.

In addition to the FMU boundaries, the Fire Plan also articulates an agency decision by setting "strategic and measurable objectives"[5] for each FMU which provide that treatment will be applied to specific percentages of designated areas in each FMU within 20 years. See Fire Plan at 9, 13-14 & 17. For example, in FMU #2 the Fire Plan sets the goal of treating 30% of areas of high and moderate fire susceptibility in the FMU (approximately 7,000 acres per year); 20% of areas of Condition Classes 2 and 3 in the FMU (approximately 4,500 acres per year); and 100% of the Defense Zones in the FMU (approximately 650 acres per year). Fire Plan at 14. The Forest Service maintains that these instructions are not a decision because the total number of acres to be treated over 20 to 25 years were established in earlier documents, see 2001 Framework FEIS, Vol. 1, Chap. 2 at 132-33,[6] and the treatment goals

---

[5] The Forest Service argues that these instructions are not decisions because they are framed as "objectives." However, the objectives clearly prescribe particular fire prevention practices for each FMU by setting forth that particular treatments be applied to particular percentages of trees in particular areas of each FMU within a particular time period. The only reason these specific criteria are framed as goals is that they may be missed due to unpredictable natural conditions or because of budgetary uncertainties. Neither of these contingencies, however, detract from the fact that the "objectives" bind the on-the-ground forest managers to execute their treatment activities in a manner designed to achieve the specific parameters.

[6] The FEIS states that "[i]n order to influence uncharacteristically severe wildfires, an estimated 30 to 40 percent of the landscape in [certain] vegetation types would receive fuel hazard reduction treatments over a 25-year period. . . . Achieving this goal would require treating approximately 130,000 acres per year, arranged in a mosaic area of treatments, each approximately 50 to 1,000 acres or more in size."

12

for each FMU are simply a division by 20 of these previously established totals.[7]  However, the 20-year totals that were established in the 2001 Framework were totals for the entire Forest, with certain types of areas designated for priority treatment.  Id.  Priority treatment would allow for a range of specific goals; the Fire Plan chooses to treat 100% of some areas and 30% of others, but could easily have chosen to treat, for example, 90% of some areas and 40% of others, which would still be consistent with the previously established forest-wide totals and designation of areas for priority treatment.  It is the environmental consequences of the choice of one specific treatment goal over another--both of which would be consistent with previously established policy--that a NEPA-approved EIS is meant to explore.  See 40 C.F.R. § 1502.14; Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 351-52 (1989).  Since the specific acreage treatment goals for each FMU were not established until the Fire Plan, the Court finds that this constitutes final agency action.

Defendant argues that the site-specific decision to thin a particular strand of trees to meet the treatment goals or to suppress or let burn a given wildland fire must still be made on the ground, and it is this on-the-ground decision, not the Fire Plan, that constitutes the consummation of the agency's decision making process.  This is not true with respect to the decision to suppress or let burn a wildland fire.  These decisions are obviously made under emergency conditions and cannot possibly be subject to NEPA review.  With regards to such decisions, the Fire Plan is the agency's last word.  Moreover, even with respect to non-emergency treatment decisions such as planned thinning, the Fire Plan constrains the on-the-ground fire managers to follow the treatment goals prescribed therein, to the extent that uncontrollable natural conditions allow.  It is therefore a decisional document.  See California v. Block, 690 F.2d 753, 762 (9th Cir. 1982) (finding that initial land allocations that constrained future, site-specific management decisions required NEPA review).

---

[7] The Forest Service also claims that these totals were generated from two other documents.  See 2004 SNFPA FSEIS ROD at 34; GSNM FEIS, Chap. II, p. 97.  Yet neither of these documents set out anything more than "broad-scale goals" for reducing threats to communities by strategically treating the Forest.  Neither document matches the specificity of the 2001 FEIS in terms of acreage goals and timetables.  Nor may either writing be reasonably read as determining the specific numbers set forth in the Fire Plan.

13

Because the Fire Plan constrains future decisions, the Forest Service's reliance on statements in the Fire Plan that it is not meant to be a decisional document is also misplaced. See Fire Plan at 4 ("The FMP is not a decision document but implements the FLRMP, GSNM and SNFPA . . . ."). If the Forest Service were able to shield agency actions from rulemaking procedures simply by including a disclaimer on operative documents, meaningful judicial review of such actions provided for under NEPA and the APA would be eliminated. It is the content of the Fire Plan--not a statement of the document's intended function--that is the basis for the determination of whether it is a decisional document.

In sum, since the Fire Plan makes several decisions beyond the scope of earlier documents--the geographic designation of the FMUs, the total suppression in areas assigned to FMU #3, and the annual acreage treatment goals for each FMU--and since at least some of the decisions it authorizes cannot be subject to NEPA review at the site specific level--such as the decision to let burn or suppress a wildland fire, once naturally ignited--the Court finds that the Fire Plan constitutes final agency action. Plaintiff has therefore established a right to review under the APA.

## II. Motion and Cross-motion for Summary Judgment

Summary judgment is appropriate if the record shows no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The parties do not contest that the Fire Plan did not undergo any NEPA review and that no Environmental Impact Statement ("EIS") was prepared; the only issue is whether, as a matter of law, the Fire Plan triggers NEPA requirements or not. Because the only issues presented here are issues of law, summary judgment is the appropriate disposition. Celotex, 477 U.S. at 322.

/ / /

/ / /

/ / /

/ / /

14

NEPA requires that an EIS be prepared for all major federal action that may significantly impact the environment.[8] 42 U.S.C. § 4332(2)(c); <u>Friends of Southeast's Future v. Morrison</u>, 153 F.3d 1059, 1062 (9th Cir. 1998). The EIS is a procedural obligation designed to ensure that agencies fully consider, and inform the public of, the environmental consequences of their actions. <u>Id.</u>, 153 F.3d at 1062. Among other things, an EIS must analyze and disclose the environmental effects of the proposed action; all reasonable alternatives to the proposed action; and all possible measures that would mitigate any adverse environmental effects. 40 C.F.R. § 1502.1.

Where a federal agency makes the decision that NEPA is inapplicable and so does not prepare an EIS or EA, the Ninth Circuit has held that the decision is reviewed for "reasonableness." <u>Northcoast Environmental Ctr. v. Glickman</u>, 136 F.3d 660, 667 (9th Cir. 1998). This is a less deferential standard than arbitrary and capricious review. <u>Id.</u>

"Federal actions" that may trigger NEPA include "[a]doption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of Federal resources, upon which future agency actions will be based." 40 C.F.R. § 1508.18(b)(2).[9] The Court finds that the Fire Plan falls within this definition because it is a formal plan prepared by the Forest Service that guides the use of resources in wildland fire response and annual treatment goals, and that future Forest Service action in suppressing wildland fires or treating specific sites will be based on the Fire Plan.

Defendant claims that the Fire Plan is not a major federal action for the same reasons as argued above with respect to whether there was a final agency action. That is, defendant claims that the Fire Plan is nothing more than a collection of decisions made in earlier documents, that the any decisions not made in earlier documents will be made at the site-

---

[8] NEPA regulations state that where it is unclear whether a proposal for major federal action will significantly affect the environment, an agency may prepare an Environmental Asssessment (EA) instead of a full EIS. 40 C.F.R. § 1501.2. If the EA indicates that there will be no significant effect on the environment, the agency must issue a Finding of No Significant Impact; if the EA indicates that there might be a significant effect, then a full EIS must be prepared. Here, the Forest Service has not prepared an EIS or an EA.

[9] "Major" reinforces, but does not have a meaning independent of, "significantly," 40 C.F.R. § 1508.18.

15

specific level and not in the Fire Plan, and that the Fire Plan is not binding but rather only offers recommendations. These arguments fail for the reasons discussed above.

In addition, the Forest Service also argues that, under Ninth Circuit precedent, to constitute "major federal action" the agency must reach the "point of commitment," or point at which there is an "irreversible and irretrievable commitment of resources," Connor v. Burford, 848 F.2d 1441, 1446 (9th Cir. 1988), and that so long as the agency retains the right to prevent the relevant activities from taking place, there is no irretrievable commitment of resources, Friends of Southeast's Future, 153 F.3d at 1063. Defendant argues that the Fire Plan does not irreversibly or irretrievably commit any resources and so does not constitute major federal action.

The Court finds the reasoning set forth in EPIC v. U.S. Forest Service, rejecting nearly identical arguments by the Forest Service in a factually similar case, to be highly persuasive. 2003 WL 22283969 at *9-*13 (relying on Kleppe v. Sierra Club, 427 U.S. 390 (1976); Kern v. United States Bureau of Land Management, 284 F.3d 1062; Port of Astoria v. Hodel, 595 F.2d 467; Environmental Defense Fund v. Andrus, 596 F.2d 848 (9th Cir. 1979), and distinguishing Connor, 848 F.2d 1441; and Friends of Southeast's Future, 153 F.3d 1059).

In the line of cases relied on by the EPIC court, the Ninth Circuit has found that an agency may not avoid NEPA review for a region-wide plan just because site-specific action remains. See Kern, 284 F.3d at 1072 (rejecting the agency's argument that no irretrievable commitment of resources had yet occurred and finding that an agency may not avoid an obligation to analyze in an EIS environmental consequences that foreseeably arise from a regional plan merely by saying that the consequences are unclear or will be analyzed later when an EA is prepared for a site-specific program proposed pursuant to the regional plan). Therefore, just because site-specific action remains does not necessarily exempt the Fire Plan from NEPA review under the "irretrievable commitment of resources" test.

Further, the Ninth Circuit has found that, in applying the "point of commitment" test, "courts are mindful of the need to avoid creating a 'catch-22' situation in which NEPA

16

analysis is not required until a point when environmental review cannot be conducted effectively." EPIC at *10 (citing Glickman, 136 F.3d at 670). At least in the context of wildland fire suppression, NEPA review can not possibly be conducted at the site-specific level because of the emergency conditions in which the fire occurs, and to allow the agency to conduct site-specific NEPA review *after* the fire has already been extinguished is contrary to the purposes of NEPA. EPIC at *12 (citing Port of Astoria, 595 F.3d at 478). The Fire Plan does commit the Forest Service to follow concrete policies including wildland fire suppression in certain areas; these policies are already in effect under the Fire Plan and there is no evidence in the record that the Forest Service has any intention of abandoning them, so NEPA review is required. EPIC at *12 (citing Port of Astoria, 595 F.3d at 478).

A proposal for major federal action must also present the possibility of significant environmental impact to necessitate the preparation of an EIS. 42 U.S.C. § 4332(2)(c); see also 40 C.F.R. § 1508.27. Defendant argues that the Fire Plan has no direct environmental impact because it makes no decisions, and so any "significant" environmental impact is traceable to earlier documents. Because the Court finds that the Fire Plan is a decisional document, the environmental impact of the decision to let burn or suppress a fire or to treat a specific area is traceable to the Fire Plan. Defendant does not and could not seriously argue that there is no possibility that the decision to let burn or suppress a major wildland fire will have any significant environmental impact. Therefore, the Court finds that the significance requirement is satisfied.

Defendant argues that its decision that the Fire Plan is not a major federal action is subject to deference unless unreasonable. Northcoast Environmental Ctr., 136 F.3d at 667. Defendant claims that because the Fire Plan makes no decisions and so is not a major federal action, its decision to forgo environmental review was reasonable. The Court finds that the Fire Plan is a major federal action, and so defendant's decision not to conduct any environmental review was unreasonable.

/ / /

/ / /

**CONCLUSION**

For the reasons set forth herein, the Court hereby GRANTS plaintiff's motion for summary judgment and DENIES defendant's motions for summary judgment and judgment on the pleadings.

The Court does not reach the remedy issue today, but rather rules that the Fire Plan in its current iteration is not in compliance with NEPA. The parties are ordered to meet and confer on the remedy issue, and thereafter appear for a case management conference on August 12, 2005 at 8:30 a.m.

**IT IS SO ORDERED.**

Dated: July 11, 2005

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE